
FILED
2012 May-01  AM 10:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FREDERICK MOORE,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:11-cv-01000-KOB** |
| | ) | |
| **J&M TANK LINES, INC.** | ) | **JURY DEMAND** |
| | ) | |
| **DEFENDANTS.** | ) | |

---

## PLAINTIFF'S CORRECTED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Cynthia Forman Wilkinson
Wilkinson Law Firm, PC
215 North Richard Arrington Blvd.
Suite 811
Birmingham, AL  35203
(205) 250-7866


Larry R. Mann
215 Richard Arrington Blvd.
Suite 701
Birmingham, AL 35203
(205) 326-6500

# TABLE OF CONTENTS

I.     INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 1

II.    PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
       FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . . . . . . . . . . 1

III.   PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS.. . . . . . . . . . . 18

       A.    PLAINTIFF'S INITIAL EMPLOYMENT.. . . . . . . . . . . . . . . . . . 18

       B.    RACIAL JOKE IN THE WORKPLACE.. . . . . . . . . . . . . . . . . . . 19

       C.    CAUCASIAN DRIVER GRANT WELLS. . . . . . . . . . . . . . . . . . 19

       D.    CAUCASIAN DRIVER GARY HILL.. . . . . . . . . . . . . . . . . . . . . 20

       E.    CAUCASIAN DRIVER NOAH STEPHENS. . . . . . . . . . . . . . . . 23

       F.    PLAINTIFF'S DISCRIMINATORY TERMINATION. . . . . . . . . 25

       G.    OTHER ACTS OF RACIAL DISCRIMINATION OR "ME TOO"
             EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       A.    PLAINTIFF'S TERMINATION WAS BASED ON HIS RACE. . . 28

             1.    PRIMA FACIE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

             2.    PRETEXT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

V.     CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## I.    INTRODUCTION

The Plaintiff, Frederick Moore, ("Plaintiff" or "Moore") was terminated based on his race, African American. Plaintiff has presented sufficient evidence of pretext through comparator evidence, factual misrepresentations on the part of the Defendant and evidence of other acts of racial discrimination. Defendant, J & M Tank Lines, ("Defendant"), has presented shifting and conflicting evidence in support if its decision to terminate Plaintiff and Defendant's Brief and Evidentiary Submissions can only be interpreted as a desperate attempt to unjustly prejudice the Plaintiff in an effort to defeat summary judgment at all costs. In applying the Summary Judgment Standard to these allegations and evidence, it is clear Plaintiff has presented a case sufficient to survive Summary Judgment under Rule 56 and Defendant's unfounded attempts to destroy Plaintiff's credibility are without consequence.

## II.    PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.    Admitted, but further clarified. Plaintiff was originally hired to work for the Defendant hauling lime and soot from Alabama Power. (PL Ex. 1, Moore Dep., p. 54). After Plaintiff was hired and was working hauling lime and soot, Plaintiff inquired about a position on the flour side of the Defendant's business delivering flour. (PL Ex. 1, Moore Dep., p. 55). Plaintiff does not recall who he talked to about

moving to the flour delivery side of the Defendant's business. (PL Ex. 1, Moore Dep., p. 55).

2.      Disputed. Plaintiff was hired to haul lime and soot and his training consisted of riding with an employee who hauled lime and another employee who hauled soot. (PL Ex. 1, Moore Dep., p. 54-56). Plaintiff was not supervised by Rick Berger when he was initially hired and trained working on the lime and soot side of the company and Plaintiff's training when he was hired was not directed by Rick Berger. (PL Ex. 1, Moore Dep., p. 57-59).  Only when Plaintiff moved to the flour side of the business was he then supervised by Caucasian Dispatcher, Rick Berger. (PL Ex. 1, Moore Dep., p. 57-58).  Berger then assigned Plaintiff to train with a flour driver named Burgess. (PL Ex. 1, Moore Dep., p. 58, 61).

3.      Admitted.

4.      Admitted, but immaterial as Plaintiff conceded this claim during the discovery phase of this litigation. Plaintiff admits his EEOC charge and Complaint include a statement regarding Caucasian employees receiving newer and better equipment. However, Defendant has failed to include in its statement of undisputed fact that, prior to the Defendant filing its Motion for Summary Judgment, Plaintiff conceded any claim regarding the discriminatory assignment of equipment or routes. Plaintiff's counsel informed the Court and counsel for the Defendant at the scheduled

Status Conference held on February 28, 2012, that Plaintiff would no longer be pursing any claim for the discriminatory assignment of equipment or routes, and that Plaintiff's only remaining claim was discriminatory termination based on his race, African American. Despite being informed of Plaintiff's intent to concede certain claims, specifically, any claims for the discriminatory assignment of equipment and routes, Defendant included these conceded claims in its Memorandum in Support Defendant's Motion for Summary Judgment in an attempt to prejudice the Plaintiff. Defendant has caused additional and unnecessary time and work for the Court in having to address these conceded claims, and additional time and work on the part of the Plaintiff who has had to address and dispute what are conceded claims.

5.      Please Plaintiff's response to (4) above.

6.      Denied. Plaintiff admits that his deposition testimony is correctly reflected for the pages referenced by the Defendant. However, Plaintiff was treated differently than Caucasian drivers who committed the same or similar mistakes and contends he was terminated because of his race, African American. When Plaintiff was informed there were Caucasian drivers who were not terminated he felt he was terminated because of his race, African American.

> Q.    And when you were told about these white drivers who were given days off or suspended for delivering the wrong load or the wrong product, did that make you feel like that you were

> terminated because of your race?
>> Mr. Kruger: Same objection.
> A.      Yes. (PL Ex. 1, Moore Dep., p. 154).

7.      Denied. Plaintiff was treated differently than Caucasian drivers who committed the same or similar mistakes and contends he was terminated because of his race, African American. When Plaintiff was informed there were Caucasian drivers who were not terminated he felt he was terminated because of his race, African American.

> Q.      And when you were told about these white drivers who were given days off or suspended for delivering the wrong load or the wrong product, did that make you feel like that you were terminated because of your race?
>> Mr. Kruger: Same objection.
> A.      Yes. (PL Ex. 1, Moore Dep., p. 154).

8.      Denied. Plaintiff did not sign a "warning memo" on January 2, 2009. On January 2, 2009, shortly after Plaintiff was hired, the Defendant's Chief Operating Officer, Jim Pickens, wrote a memo to the "Flour Drivers" regarding pre-trip inspection procedures, instructing them on the proper procedure for verifying paperwork, trailer numbers and seals numbers before leaving the property. (PL Ex. 2, Defendant's Statement of Position to the EEOC, p. 2, 5; and PL Ex. 3, January 2, 2009 Memo to Flour Drivers).

The January 2, 2009 Memo was not a warning memo or disciplinary action, but

a memo to let the drivers know the policy with regard to pre-trip inspections.

> Q.    But you understood that this memo was letting the drivers know
> what the policy was with regard to pre-trip inspection; correct?
>
> A.    Yes, ma'am. (PL Ex. 4, Charlie Pickens Dep., p. 28).

Plaintiff had never been disciplined or warned with regard to hooking up to the wrong trailer prior to his termination. (PL Ex. 4, Charlie Pickens Dep., p. 34).

9.    Denied as to the pre-trip inspection memo being referred to as a "warning memo." Plaintiff admits the January 2, 2009, pre-trip inspection memo states in part what is reflected.

10.    Denied. Plaintiff was treated differently than Caucasian drivers who committed the same or similar mistake and does not admit that his termination was "in accordance with the rules." Plaintiff was treated differently than Caucasian drivers who committed the same or similar mistakes and contends he was terminated because of his race, African American. When Plaintiff was informed there were Caucasian drivers who were not terminated he felt he was terminated because of his race, African American.

> Q.    And when you were told about these white drivers who were
> given days off or suspended for delivering the wrong load or the
> wrong product, did that make you feel like that you were
> terminated because of your race?
>
> Mr. Kruger: Same objection.
>
> A.    Yes. (PL Ex. 1, Moore Dep., p. 154).

11.     Admitted, however, Rick Berger, Caucasian Dispatcher/Supervisor, also had input in the decision to terminated Plaintiff's employment. (PL Ex. 6, Berger Dep., p. 11-12, 13-15).

12.     Plaintiff admits Jim Perkins testified as stated.

13.     Disputed. Jim Pickens testified it was made pretty plain to Berger, not when he wrote the memo, "It was pretty plain made to Mr. Berger..." (PL Ex. 7, Jim Pickens Dep., p. 22).

14.     Denied. Rick Berger, Caucasian Dispatcher/Supervisor who dispatched the flour delivery drivers out of Birmingham, Alabama and Barnesville, Georgia, testified he thought the January 2, 2009 Memo was distributed to all the flour drivers, both in Birmingham, Alabama and Barnesvile, Georgia, who delivered flour for the Defendant's customer Milner Milling. (PL Ex. 6, Berger Dep., p. 31, 69, 75-76). The flour drivers in Birmingham and Barnesville were under the same policies and procedures, and the same level of performance was expected of the Barnesville flour drivers as was expected of the Birmingham flour drivers because it was the same customer. (PL Ex. 6, Berger Dep., p. 69-70). In addition, the Defendant submitted a list of "Flour Division Disciplined Employees During Relevant Period," which included   flour drivers working in Birmingham and Barnesville. (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period).

When specifically questioned about the January 2, 2009 memo, Berger testified:

> Q.    When you -- you saw a copy of this memo when it came out; is that correct?
> A.    This one?
> Q.    Yes, sir.
> A.    Yes.
> Q.    And you understood that it went to all flour drivers; is that - -
> A.    Well, I assumed.
> Q.    And it says flour drivers; correct?
> A.    Yes.
> Q.    It doesn't limit it to Birmingham only, does it?
> A.    It doesn't say that, you are right.
> Q.    And the flour drivers were dispatched out of Barnesville; is that correct?
> A.    Yes.
> Q.    And you've told me that the policies were the same for Birmingham as they were for Barnesville; is that correct?
> A.    Yes.
> Q.    And based on what you understood when this policy came out, it applied to Barnesville as well; correct?
> A.    That's my assumption. (PL Ex. 6, Berger Dep., p. 75-76).

When counsel for the Defendant questioned Berger, he again confirmed that he thought the January 2, 2009 memo was given to the Barnesville, Georgia flour drivers as well as the flour drivers in Birmingham, Alabama.

> Q.    You do not have any personal knowledge, do you, whether or not a letter like this was given out to any drivers at the Barnesville terminal, do you?
>        MS. WILKINSON: Object to the form.
> A.    I think they were given out to everybody, I thought. (PL Ex. 6, Berger Dep., 74-75).

15.    Admitted.

16.    Denied. Gary Hill, Caucasian flour driver, pumped product into the wrong silo when he was delivering flour to a customer. (PL Ex. 8, Hill Dep., p. 34-35). Hill was delivering to Flowers Bakery in Villa Rica, Georgia, and Hill was supposed to verify that he was pumping the correct product into the correct silo, which was the Defendant's policy. (PL Ex. 8, Hill Dep., p. 34-36, 37-38). Flowers Bakery had to clean out the silo after Hill pumped in the wrong product, because they were unable to use the product. (PL Ex. 8, Hill Dep., p. 52-53). Hill had to go to Flowers Bakery with a couple of other employees of the Defendant and pump out the silo, because it take sat least three people to pump out a silo. (PL Ex. 8, Hill Dep., p. 54, 58). Hill was supervised by Rick Berger and received a three day suspension. (PL Ex. 8, Hill Dep., p. 64). A document was prepared regarding Hill's suspension, however, the Defendant has been unable to locate this documentation. (PL Ex. 8, Hill Dep., p. 64, 67-68).

17.    Denied. Hill was supposed to verify that he was pumping the correct product into the correct silo, which was the Defendant's policy. (PL Ex. 8, Hill Dep., p. 34-36, 37-38).

18.    Denied. In December 2009, Wells hit a parked truck on the side of the road while driving a J & M truck, causing damage to the vehicle. (Pl Ex. 9, Wells

Dep., p. 12-13, 15). Wells called his supervisor Rick Berger, but failed to follow the Defendant's policy when he failed to also call the police. (PL Ex. 9, Wells Dep., p. 13, 18). When Wells called Berger he told Berger he just left the scene of an accident and that he was "probably going to get fired." (PL Ex. 9, Wells Dep., p. 21). Berger told Wells not to worry about it and Berger just wanted Wells to just take another load. (PL Ex. 9, Wells Dep., p. 21). Wells made no attempt to locate the owner of the truck. (PL Ex. 9, Wells Dep., p. 14). Wells left the scene of the accident and drove to the Defendant's trucking dispatch yard. (PL Ex. 9, Wells Dep., p. 16). Wells knew he was not supposed to move his vehicle from the scene of the accident because it could prevent there from being an accurate investigation. (PL Ex. 9, Wells Dep., p. 21-22). Wells has attended safety meetings while he has been employed by the Defendant during these safety meetings not to leave the scene of the accident, report the accident, and call the police.  (PL Ex. 9, Wells dep., p. 24-25). The safety committee members informed Wells the accident was preventable and he **violated the Defendant's policies**. (PL Ex. 9, Wells Dep., p. 27-28)(emphasis added).

19.     Denied. The Defendant would like the Court to believe that African American employee, Kenny Brown, was the decision maker with regard to the suspension of two Barnesville, Georgia drivers who violated the January 2, 2009 pre-trip inspection memo and Defendant's training and policies with regard to driver

deliveries. However, the evidence does not support Defendant's assertion that the two Barnesville, Georgia drivers were "under a different supervisor" and that "there was a different decision maker."

The Defendant submitted list of "Flour Division Disciplined Employees During Relevant Period," which included flour drivers working in Birmingham and Barnesville. (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period, Bates # PL-000026). Noah Stephens and Doug Walker are the two Barnesville, Georgia flour drivers. (PL Ex. 7, Jim Pickens Dep., p. 25). Based on the Defendant's list of "Flour Division Disciplined Employees During Relevant Period," submitted to the EEOC, Stephens and Walker were both suspended on **February 8, 2010**, and the discipline decision maker was "**Jim Pickens**." (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period, Bates # PL-000026).

Kenny Brown, who is currently employed as a Driver Manager/Loader, testified he was not the Driver Manager in Barnesville, Georgia in March 2012. (PL Ex. 11, Brown Dep., p. 6, 67, 70).

> Q.    But you were not the driver manager in March of '010, were you?
> A.    No, ma'am, I don't -- no, ma'am.
> Q.    Don't think so?
> A.    No, ma'am. (PL Ex. 11, Brown Dep., p. 67).
> Q.    But in February of 2010, you were not the driver manager

because you said in March you were not?

    A.    No, ma'am. (PL Ex. 11, Brown Dep., p. 70).[1]

20.    Denied. Doug Walker delivered flour to the wrong bakery. (PL Ex. 11, Brown Dep., p. 29). Walker had delivery paperwork documenting he was supposed to be delivering flour to Savannah, Georgia, but instead he delivered the flour to the wrong location in Suwanee, Georgia. (PL Ex. 11, Brown Dep., p. 29-30). Walker unloaded two thousand pounds into the incorrect silo at the wrong location in Suwanee, Georgia. (PL Ex. 11, Brown Dep., p. 30).

21.    Denied. Noah Stephens had the right paperwork and hooked to the wrong trailer. (PL Ex. 11, Brown Dep., p. 22-23, 70). Stephens hooked to the wrong trailer and got about twenty minutes down the road before he realized he hooked to the wrong trailer. (PL Ex. 11, Brown Dep., p. 28-29). Stephens had to come back to the yard which caused Stephens to be late for his timed delivery. (PL Ex. 11, Brown Dep., p. 29).

22.    Denied. The  flour drivers in Birmingham and Barnesville were under the same policies and procedures, and the same level of performance was expected of the Barnesville flour drivers as was expected of the Birmingham flour drivers

---

[1]Brown did testify he suspended Walker and Stephens, however, he testified it was in the fall of 2010. Brown also testified he does not recall documenting the suspensions in any manner, having Walker and Stephens sign any disciplinary documentation, or placing any documentation in the personnel files of these employees. (PL Ex. 11, Brown Dep., p. 13, 16, 37, 38-39).

because it was the same customer. (PL Ex. 6, Berger Dep., p. 69-70).

When specifically questioned about the January 2, 2009 memo, Berger testified:

> Q.    When you -- you saw a copy of this memo when it came out; is that correct?
> A.    This one?
> Q.    Yes, sir.
> A.    Yes.
> Q.    And you understood that it went to all flour drivers; is that - -
> A.    Well, I assumed.
> Q.    And it says flour drivers; correct?
> A.    Yes.
> Q.    It doesn't limit it to Birmingham only, does it?
> A.    It doesn't say that, you are right.
> Q.    And the flour drivers were dispatched out of Barnesville; is that correct?
> A.    Yes.
> Q.    And you've told me that the policies were the same for Birmingham as they were for Barnesville; is that correct?
> A.    Yes.
> Q.    And based on what you understood when this policy came out, it applied to Barnesville as well; correct?
> A.    That's my assumption. (PL Ex. 6, Berger Dep., p. 75-76).

When counsel for the Defendant questioned Berger, he again confirmed that he thought the January 2, 2009 memo was given to the Barnesville, Georgia flour drivers as well as the flour drivers in Birmingham, Alabama.

> Q.    You do not have any personal knowledge, do you, whether or not a letter like this was given out to any drivers at the Barnesville terminal, do you?
>          MS. WILKINSON: Object to the form.

Page 12 of 36

> A.   I think they were given out to everybody, I thought. (PL Ex. 6, Berger Dep., 74-75).

23.   Denied. The testimony referenced by the Defendant is not contained on page 31 of Brown's deposition. While Brown does testify on page 32 of his deposition that the Walker and Stephens incidents happened within a couple days of each other, the list of "Flour Division Disciplined Employees During Relevant Period," indicates Walker and Stephens were both disciplined on February 8, 2010. (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period, Bates # PL-000026).

24.   Denied. Kenny Brown, who is currently employed as a Driver Manager/Loader, testified he was not the Driver Manager in Barnesville, Georgia in February 2010, when walker and Stephens were suspended. (PL Ex. 11, Brown Dep., p. 6, 67, 70).

> Q.   But you were not the driver manager in March of '010, were you?
> A.   No, ma'am, I don't -- no, ma'am.
> Q.   Don't think so?
> A.   No, ma'am. (PL Ex. 11, Brown Dep., p. 67).
> Q.   But in February of 2010, you were not the driver manager because you said in March you were not?
> A.   No, ma'am. (PL Ex. 11, Brown Dep., p. 70).

Walker and Stephens were suspended instead of being terminated on February 8, 2010, and the same rules set forth in the January 2, 2009 memo applied to the

Barnesville, Georgia flour drivers. Stephens, the Caucasian flour driver, is a direct comparator to Plaintiff in that he hooked up to the wrong trailer and left the yard to deliver the wrong product to the customer. (PL Ex. 11, Brown Dep., p. 22-23, 28-29, 70).

25.    Denied. Plaintiff, African American, was terminated, when Stephens and Hill, who are Caucasian, were suspended. Based on the Defendant's list of "Flour Division Disciplined Employees During Relevant Period," submitted to the EEOC, Stephens and Walker were both suspended on **February 8, 2010**, and the discipline decision maker was "**Jim Pickens**." (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period, Bates # PL-000026).

Gary Hill, Caucasian flour driver, pumped product into the wrong silo when he was delivering flour to a customer. (PL Ex. 8, Hill Dep., p. 34-35). Hill was delivering to Flowers Bakery in Villa Rica, Georgia, and Hill was supposed to verify that he was pumping the correct product into the correct silo, which was the Defendant's policy.  (PL Ex. 8, Hill Dep., p. 34-36, 37-38). Flowers Bakery had to clean out the silo after Hill pumped in the wrong product, because they were unable to use the product. (PL Ex. 8, Hill Dep., p. 52-53). Hill had to go to Flowers Bakery with a couple of other employees of the Defendant and pump out the silo, because it take sat least three people to pump out a silo. (PL Ex. 8, Hill Dep., p. 54, 58). Hill was

supervised by Rick Berger and received a three day suspension. (PL Ex. 8, Hill Dep.,

p. 64).

26.    Denied. Kenny Brown, who is currently employed as a Driver

Manager/Loader,  testified he was not the Driver Manager in Barnesville, Georgia in

February 2010, when Walker and Stephens were suspended. (PL Ex. 11, Brown Dep.,

p. 6, 67, 70).

> Q.    But you were not the driver manager in March of '010, were you?
> A.    No, ma'am, I don't -- no, ma'am.
> Q.    Don't think so?
> A.    No, ma'am. (PL Ex. 11, Brown Dep., p. 67).
> Q.    But in February of 2010, you were not the driver manager because you said in March you were not?
> A.    No, ma'am. (PL Ex. 11, Brown Dep., p. 70).

In addition, based on the Defendant's list of "Flour Division Disciplined

Employees During Relevant Period," submitted to the EEOC, Stephens and Walker

were both suspended on **February 8, 2010**, and the discipline decision maker was

"**Jim Pickens**" not Kenny Brown. (PL Ex. 10, Defendant's List of Flour Division

Disciplined Employees During Relevant Period, Bates # PL-000026).

27.    Admitted, but immaterial to the facts before this Court regarding

Defendant's Motion for Summary Judgment. The only reason the Defendant has

presented this immaterial information is to attempt to improperly prejudice the

Plaintiff.

28.     Again, the Defendant has included an alleged undisputed fact regarding claims which have been properly conceded by the Plaintiff after conducting discovery. There is no reason for the Defendant to include any alleged undisputed fact related to Plaintiff's voluntarily dismissed claims, except to attempt to prejudice the Plaintiff.

29.     Denied. Plaintiff's claims against Ryder were supported by the evidence. In addition to Plaintiff filing suit against Ryder several other former African American drivers also filed suit against Ryder, regarding the same or similar race discrimination claims asserted by the Plaintiff.

a.     On September 24, 2008, African American driver, Antonio Jones, filed suit against Ryder regarding claims of racial discrimination and retaliation. Jones alleged, in part, in his Complaint that the African American drivers are assigned the lower paying and more difficult routes. (DOC 1, ¶ 7). On October 13, 2009,  Judge Johnson denied Ryder's Motion for Summary Judgment in *Jones v. Ryder*, Case No. CV-08-J-1769-S, DOC 67). (PL Ex. 16, Order Denying Motion for Summary Judgment)

b.     On September 14, 2009, Antonio Jones filed his Opposition in Response to Defendant's Motion for Summary Judgment.  Jones

presented substantial "me too" evidence to support his claims and the

"me too" evidence submitted by Jones includes claims which are

virtually identical to the claims Frederick Moore filed against Ryder.

(*Jones v. Ryder*, Case No. CV-08-J-1769-S, DOC 51). (PL Ex. 18,

Plaintiff's Response in Opposition to Defendant's Motion for

Summary Judgment).

30.    Denied. Plaintiff and Ryder jointly filed a stipulation of dismissal.

(*Moore v. Ryder*, Case No. 2:11-cv-3584-JHH, DOC 15). (PL Ex. 15, *Moore v. Ryder,*

Case No. 2:11-cv-3584-JHH, Parties Joint Stipulation of Dismissal).  Defendant's

unfounded assertions are stated for the sole purpose of trying to prejudice the

Plaintiff. Any claims of discrimination Plaintiff pursued against Ryder have no

relevance to the matters before this Court and should be stricken from the record.

31.    Admitted. (PL Ex. 17, Complaint, *Moore v. Ryder*, Case No. 2:11-cv-

3584-JHH, DOC 1).

32.    Admitted. Plaintiff's accidental damage to a trailer while he was

employed with Ryder does not indicate Plaintiff was not a good employee with a

good driving record.

33.    Denied. Plaintiff, Frederick Moore, filed claims of racial discrimination

against Ryder which were similar to claims filed by Antonio Jones. Ryder filed a

Motion for Summary Judgment in the Jones case, which was denied by Judge Johnson. Jones presented substantial "me too" evidence to support his claims and the "me too" evidence submitted by Jones includes claims which are virtually identical to the claims Frederick Moore filed against Ryder. Judge Johnson denied Ryder's Motion for Summary Judgment. (PL Ex. 16, Order Denying Motion for Summary Judgment, *Jones v. Ryder*, Case No. CV-08-J-1769-S, DOC 67) (PL Ex. 17, Complaint, *Moore v. Ryder*, Case No. 2:11-cv-3584-JHH, DOC 1).

34.    Denied. Plaintiff, Frederick Moore, filed claims of racial discrimination against Ryder which were similar to claims filed by Antonio Jones. Ryder filed a Motion for Summary Judgment in the Jones case, which was denied by Judge Johnson. Jones presented substantial "me too" evidence to support his claims and the "me too" evidence submitted by Jones includes claims which are virtually identical to the claims Frederick Moore filed against Ryder. Judge Johnson denied Ryder's Motion for Summary Judgment. (PL Ex. 16, Order Denying Motion for Summary Judgment, *Jones v. Ryder*, Case No. CV-08-J-1769-S, DOC 67) (PL Ex. 17, Complaint, *Moore v. Ryder*, Case No. 2:11-cv-3584-JHH, DOC 1).

## III.   PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

### A.   PLAINTIFF'S INITIAL EMPLOYMENT

1.    Plaintiff, Frederick Moore, was hired by the Defendant, J & M Tank

Lines, Inc., as a truck driver and was initially assigned hauling lime and soot from Alabama Power. (PL Ex. 1, Moore Dep., p. 53-54).

2.     Not long after Plaintiff was hired he requested to move into a truck driver position hauling flour for the flour side of the business, and was subsequently transferred to work as a flour driver. (PL Ex. 1, Moore Dep., p. 55, 57).

3.      Rick Berger, Caucasian, was the Dispatcher/Supervisor on the flour side of the Defendant's business. (PL Ex. 1, Moore Dep., p. 57-58).

### B.   RACIAL JOKE IN THE WORKPLACE

4.     One evening when Plaintiff returned from taking a load of flout to a customer, a Caucasian driver named Sleigal and Rick Berger were sitting in the office and Sleigal called Plaintiff into the office stating "You might want to hear this." (PL Ex. 1, Moore Dep., p. 114).

5.     When Plaintiff entered the office Sleigal began telling a racial joke, and when Sleigal saw Plaintiff he and Berger laughed. (PL Ex. 1, Moore Dep., p. 114).

### C.   CAUCASIAN DRIVER GRANT WELLS

6.     Grant Wells, Caucasian flour driver, is a current employee who has been employed with the Defendant for three years. (PL Ex. 9, Wells Dep., p. 8).

7.     In December 2009, Wells hit a parked truck on the side of the road while driving a J & M truck, causing damage to the vehicle. (PL Ex. 9, Wells Dep., p. 12-

13, 15).

8.    Wells called his supervisor Rick Berger, but failed to follow the Defendant's policy when he failed to also call the police. (PL Ex. 9, Wells Dep., p. 13, 18).

9.    When Wells called Berger he told Berger he just left the scene of an accident and that he was "probably going to get fired." (PL Ex. 9, Wells Dep., p. 21).

10.    Berger told Wells not to worry about it as Berger wanted Wells to just take another load. (PL Ex. 9, Wells Dep., p. 21).

11.    Wells made no attempt to locate the owner of the truck. (Pl Ex. 9, Wells Dep., p. 14).

12.    Wells left the scene of the accident and drove to the Defendant's trucking dispatch yard. (PL Ex. 9, Wells Dep., p. 16).

13.    Wells knew he was not supposed to move his vehicle from the scene of the accident because it could prevent there from being an accurate investigation. (PL Ex. 9, Wells Dep., p. 21-22).

14.    Wells has attended safety meetings while he has been employed by the Defendant during these safety meetings not to leave the scene of the accident, report the accident, and call the police.  (PL Ex. 9, Wells dep., p. 24-25).

15.    Wells did not even leave a note on the truck he hit to provide the owner

with his contact information. (PL Ex. 9, Wells Dep., p. 16).

16.     Wells was subsequently criminally charged with hit and run, or leaving the scene of an accident. (PL Ex. 9, Wells Dep., p. 15).

17.     The truck Wells was driving was damaged and had to be repaired by the Defendant. (PL Ex. 9, Wells Dep., p. 19).

18.     The Defendant's safety committee met to review the accident and Wells had to meet with the safety committee. (PL Ex.9, Wells dep., p.  27).

19.     The safety committee members informed Wells the accident was preventable and that he violated the Defendant's policies. (PL Ex. 9, Wells Dep., p. 27-28).

### D.     CAUCASIAN DRIVER GARY HILL

20.     Gary Hill, Caucasian flour driver, pumped product into the wrong silo when he was delivering flour to a customer. (PL Ex. 8, Hill Dep., p. 34-35).

21.     Rick Berger, Caucasian, was the Dispatcher/Terminal Manager, when this incident occurred. (PL Ex. 6, Berger Dep., p. 43).

22.     Hill was delivering to Flowers Bakery in Villa Rica, Georgia, and Hill was supposed to verify that he was pumping the correct product into the correct silo, which was the Defendant's policy.  (PL Ex. 8, Hill Dep., p. 34-36, 37-38).

23.     Flowers Bakery had to clean out the silo after Hill pumped in the wrong

product, because they were unable to use the product. (PL Ex. 8, Hill Dep., p. 52-53).

24.    Hill had to go to Flowers Bakery with a couple of other employees of the Defendant and pump out the silo, because it take sat least three people to pump out a silo. (PL Ex. 8, Hill Dep., p. 54, 58).

25.    Hill's actions, pumping product into the wrong silo, cost the Defendant money. (PL Ex. 7, Jim Pickens Dep., p. 67).

26.    The Defendant incorrectly represented to the EEOC in response to Plaintiff's Charge, that the other "identified employees' errors did not result in a significant impact on the customer or company. ( PL Ex. 12,  Defendant's October 5, 2012, Correspondence to the EEOC, p. 2).

27.    The Defendant further failed to inform the EEOC that Hill's actions cost the Defendant money. ( PL Ex. 12, Defendant's October 5, 2012, Correspondence to the EEOC).

28.    In addition, while Hill was pumping the incorrect product out of the customer's silo he was unable to work as a driver delivering flour for the Defendant, and the other two employees assisting him were unable to perform their normally assigned duties. (PL Ex. 7, Jim Pickens Dep., p. 68-69).

29.    Hill was supervised by Rick Berger and received a three day suspension. (PL Ex. 8, Hill Dep., p. 64).

30.     A document was prepared regarding Hill's suspension, however, the Defendant has been unable to locate this documentation. (PL Ex. 8, Hill Dep., p. 64, 67-68).

**E.    CAUCASIAN DRIVER NOAH STEPHENS**

31.     Noah Stephens is a Barnesville, Georgia flour driver. (PL Ex. 7, Jim Pickens Dep., p. 25).

32.     Based on the Defendant's list of "Flour Division Disciplined Employees During Relevant Period," submitted to the EEOC, Stephens and Walker were both suspended on **February 8, 2010**, and the discipline decision maker was "**Jim Pickens**." (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period, Bates # PL-000026).

33.     Noah Stephens, a Caucasian flour driver had the right paperwork and hooked to the wrong trailer. (PL Ex. 11, Brown Dep., p. 22-23, 70).

34.     Stephens hooked to the wrong trailer and got about twenty minutes down the road before he realized he hooked to the wrong trailer. (PL Ex. 11, Brown Dep., p. 28-29).

35.     Stephens had to come back to the yard which caused Stephens to be late for his timed delivery. (PL Ex. 11, Brown Dep., p. 29).

36.     The  flour drivers in Birmingham and Barnesville were under the same

policies and procedures, and the same level of performance was expected of the Barnesville flour drivers as was expected of the Birmingham flour drivers because it was the same customer. (PL Ex. 6, Berger Dep., p. 69-70).

37.   When specifically questioned about the January 2, 2009 memo, Rick Berger, Dispatcher/Supervisor, who dispatched for the Barnesville terminal, testified:

> Q.   When you -- you saw a copy of this memo when it came out; is that correct?
> A.   This one?
> Q.   Yes, sir.
> A.   Yes.
> Q.   And you understood that it went to all flour drivers; is that - -
> A.   Well, I assumed.
> Q.   And it says flour drivers; correct?
> A.   Yes.
> Q.   It doesn't limit it to Birmingham only, does it?
> A.   It doesn't say that, you are right.
> Q.   And the flour drivers were dispatched out of Barnesville; is that correct?
> A.   Yes.
> Q.   And you've told me that the policies were the same for Birmingham as  they were for Barnesville; is that correct?
> A.   Yes.
> Q.   And based on what you understood when this policy came out, it applied to Barnesville as well; correct?
> A.   That's my assumption. (PL Ex. 6, Berger Dep., p. 75-76).

38.   When counsel for the Defendant questioned Berger, he again confirmed that he thought the January 2, 2009 memo was given to the Barnesville, Georgia flour drivers as well as the flour drivers in Birmingham, Alabama.

Q.      You do not have any personal knowledge, do you, whether or not a letter like this was given out to any drivers at the Barnesville terminal, do you?
            MS. WILKINSON: Object to the form.
A.      I think they were given out to everybody, I thought. (PL Ex. 6, Berger Dep., 74-75).

## F.    PLAINTIFF'S DISCRIMINATORY TERMINATION

39.     Plaintiff arrived at work on  Saturday morning to deliver flour to a customer and it was raining when Plaintiff arrived in the yard to hook his truck to the trailer to be delivered. (PL Ex. 1, Moore Dep., p. 85).

40.     The trailer Plaintiff was to deliver was sitting right next to another trailer and both trailers had similar numbers, one of them was number 68 and one was 64. (PL Ex. 1, Moore Dep., p. 85).

41.     Plaintiff was unable to see the numbers on the trailer due to the rain so he got out of the truck to verify the numbers on the delivery paperwork he had been given and the number on the trailer. (PL Ex. 1, Moore Dep., p. 86).

42.     Because it was raining Plaintiff was unable to take the paperwork out in the rain with him to verify the numbers. (PL Ex. 1, Moore Dep., p. 86).

43      Plaintiff checked the numbers on the trailer and turned his truck around to hook to the trailer, and Plaintiff over shot his turn and ended up in front of the wrong trailer by mistake. (PL Ex. 1, Moore Dep., p. 86).

44.     This was the first time Plaintiff had hooked up to the wrong trailer. (PL Ex. 1, Moore Dep., p. 90)

45.     When a driver delivers a tank of flour to a customer the receiver, the person employed by the customer who directs the driver to the correct silo to unload the flour, is supposed to check the paperwork to make sure the numbers on the paperwork match the numbers on the trailer to be unloaded. (PL Ex. 1, Moore Dep., p. 96, 9, 1248).

46.     Plaintiff pumped the flour load in his trailer into the silo he was directed to use by the receiver. (PL Ex. 1, Moore Dep., p. 99).

47.     Plaintiff returned to the yard and tried to talk to Berger about his job, however, Berger was not present. (PL Ex. 1, Moore Dep., p. 100-101).

48.     The next day Plaintiff was terminated by Berger, however, Berger informed Plaintiff it was not his decision.  (PL Ex. 1, Moore Dep., p. 100).

49.     Plaintiff was terminated on or about September 4, 2009, and the stated reason on Plaintiff's Separation Notice was, "Driver did not follow company policies and procedures." (PL Ex. 13, Moore's Separation Notice).

50.     Plaintiff's actions did not cost the Defendant any money. (PL Ex. 7, Jim Pickens Dep., p. 69-70).

51.     Despite Jim Pickens, Chief Operating Officer, testifying that Plaintiff's

actions **did not** cost the Defendant any money, the Defendant informed the EEOC, "Charging Party's failure to follow the policies and procedures resulted in a significant cost to the Company and had significant impact on the customer." (PL Ex. 12, Defendant's October 5, 2012, Correspondence to the EEOC, p. 2; PL Ex. 7, Jim Pickens Dep., p. 7, 69-70).

52.     Plaintiff was  a good employee who came to work every day, reported to work on time and did what he was supposed to do. (PL Ex. 1, Moore Dep., p. 101-102).

53.     Plaintiff does not recall there being any issues with the seals on the tanks being checked against the delivery paperwork. (PL Ex. 1, Moore Dep., p. 110-111).

### G.     OTHER ACTS OF RACIAL DISCRIMINATION OR "ME TOO" EVIDENCE

54.     African American driver, Larry Duncan, filed a Charge of Discrimination with the EEOC on August 5, 2010, regarding claims of racial discrimination, and filed a lawsuit on June 30, 2011. (PL Ex. 14, Duncan EEOC Charge; PL Ex. 14, Complaint, *Duncan v. J & M Tank Lines*, DOC 1).

55.     Duncan contends that Caucasian employees are **not** disciplined for violations when African American employees are disciplined, and that African American employees are disciplined more harshly for the same or similar violations. (PL Ex. 14, Duncan EEOC Charge; PL Ex. 14, Complaint, *Duncan v. J & M Tank*

*Lines*, DOC 1).

## VII.   ARGUMENT

### A.   PLAINTIFF'S TERMINATION WAS BASED ON HIS RACE

#### 1.   PRIMA FACIE CASE

Defendant acknowledges Plaintiff has established he is a member of a protected class and was subjected to an adverse action, the first two elements of the prima facie case.  Defendant contends Plaintiff was not qualified for the flour driver position and Caucasian drivers were not treated more favorable than Plaintiff. Plaintiff has presented sufficient facts to establish he was qualified for the flour driver position and that Caucasian flour drivers were treated more favorably when they were suspended for committing the same or similar mistake as Plaintiff, however Plaintiff was terminated.

Defendant's Motion for Summary Judgment centers on its contention Plaintiff was not similarly-situated to another flour driver because the conduct of which Plaintiff was accused was somehow *different* than that of white flour drivers.  This argument is disingenuous based on the evidence obtained during the depositions of Defendant's own employees as outlined above.

The significant evidence presented is of the difference in treatment Plaintiff received, in comparison to the Caucasian flour drivers, and should preclude summary

judgment. Plaintiff has satisfied the *Maniccia* requirements of establishing a comparator. *Maniccia v. Brown*, 171 F.3d 1364, 1368. When viewing the nature of the offenses and the nature of the punishments, it is clear that the Caucasian Foremen received preferential treatment. *See Maniccia*, 171 F.3d 1364, 1368 (11th Cir. 1999)(Courts must consider the nature of offenses and the punishments imposed in evaluating comparators.).

Plaintiff has presented three Caucasian flour drivers who violated company policy and were not terminated. Gary Hill, Caucasian flour driver, pumped flour into the wrong silo costing the Defendant money and employee hours. Hill was only suspended and not terminated. Noah Stephens, Caucasian flour driver, hooked to the wrong trailer and got about twenty minutes down the road before he realized he hooked to the wrong trailer. (PL Ex. 11, Brown Dep., p. 28-29). Stephens had to come back to the yard which caused Stephens to be late for his timed delivery. (PL Ex. 11, Brown Dep., p. 29). Gary Wells, Caucasian flour driver, hit a parked vehicle causing damage to the company truck he was operating as well as the parked vehicle. Wells left the scene of the accident and was subsequently criminally charged with hit and run. (Pl Ex. 9, Wells Dep., p. 12-13, 15). Wells failed to follow the Defendant's policy when he failed to also call the police. (PL Ex. 9, Wells Dep., p. 13, 18). The safety committee members informed Wells the accident was preventable and that he violated

the Defendant's policies, yet he was not terminated. (PL Ex. 9, Wells Dep., p. 27-28).

In addition to establishing the *Maniccia* elements for a prima facie case, *Smith v. Lockheed-Martin Corporation*, 644 F.3d 1321 (11th Cir. 2011), allows for a plaintiff to survive summary judgment without such a strictly-analyzed comparator, if the totality of the circumstances shows sufficient circumstantial evidence from which a jury could infer a defendant displayed a racially discriminatory animus toward a plaintiff. *See Lockheed*, 644 F.3d at 1345.  Plaintiff has presented ample evidence to establish an inference of discrimination sufficient to preclude summary judgment.

The Eleventh Circuit recently vacated and remanded a district court's granting of summary judgment in *Smith v. Lockheed-Martin Corporation*, 644 F.3d 1321 (11th Cir. 2011).  The holding in *Lockheed* states:

> Establishing the elements of *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom plaintiff's case.
>
> The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.

> A plaintiff may raise a reasonable inference of the employer's
> discriminatory intent through various forms of circumstantial evidence.
> Yet, no matter its form, so long as the circumstantial evidence raises a
> reasonable inference that the employer discriminated against the
> plaintiff, summary judgment is improper. *Smith v. Lockheed-Martin
> Corp.*, 2011 WL 2567777, at*4.

Plaintiff has presented evidence beyond comparative evidence to establish pretext and discredit the reasons given by Dunn for its decisions. *Lockheed* affirms the Court's prior decision in *Goldsmith v. Bagby Elevator Company*, 513 F.3d 1261, 1286 (11th Cir. 2008), for the proposition that, "finding evidence of other acts of discrimination by the same decisionmaker against other employees in the plaintiff's protected group to be admissible under Fed.R.Evid. 404(b) because that evidence is probative of the decisionmaker's discriminatory intent." *Id.*, * 15.

Plaintiff further presented evidence of the Defendant's shifting decision makers with regard to comparators presented by the Plaintiff. Specifically, the Defendant blatantly changing the decision maker from Jim Pickens, Caucasian Chief Operating Officer, to Kenny Brown, African American Driver Manager/Loader. Brown testified he was not the Driver Manager at the time Walker and Stephens were suspended on February 8, 2010. In addition, the Defendant submitted a list of "Flour Division Disciplined Employees During Relevant Period," to the EEOC in response to Plaintiff's EEOC Charge, which includes  flour drivers working in Birmingham and

Barnesville. (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period). Based on the Defendant's list of "Flour Division Disciplined Employees During Relevant Period," submitted to the EEOC, Stephens and Walker were both suspended on **February 8, 2010**, and the discipline decision maker was "**Jim Pickens**." (PL Ex. 10, Defendant's List of Flour Division Disciplined Employees During Relevant Period, Bates # PL-000026).

Despite the evidence that Kenny Brown was not the decision maker when Walker and Stephens were suspended, the Defendant has repeatedly represented to this Court Brown was the decision maker. Clearly, this creates a genuine issue of material fact and precludes summary judgment.

All of this evidence, when combined, presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision makers." *Lockheed*.

The Eleventh Circuit has addressed its holding in *Lockheed* in *Edmond v. University of Miami*, 2011 WL 4495638 (Sept.29, 2011) and *Stephens v. Manatee County*, 2011 WL 5869803 (Nov. 22, 2011). In *Edmond*, this Court affirmed the ability of a plaintiff to prove a claim of discrimination "through circumstantial evidence under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* or alternatively, by presenting

circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." 2011 WL 4495638, at *1 (Internal citations omitted).[2]

In *Stephens,* this Court stated the plaintiff could survive summary judgment despite failing to establish a prima facie case or demonstrate pretext, "if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," citing *Lockheed.* 2011 WL 5869803, at *5. In *Stephens*, the Court found the record was "bereft" of evidence that race had anything to do with the plaintiff's termination. *Id*. at *6.

Despite the obvious differences in the opinions in *Stephens, Edmond* and the facts presented by the Plaintiff, these cases confirm the import of the *Lockheed* analysis in discrimination cases. All of the evidence presented by Plaintiff creates a triable issue as to his claims of discrimination under the holding in *Lockheed*.

## 2.   PRETEXT

Once an employer has asserted an allegedly legitimate reason for the adverse action, the burden shifts to the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employers legitimate reasons that a reasonable factfinder could find unworthy of credence.

---

[2]In Edmond, the plaintiff only presented evidence of a comparator who was of his same race and national origin to support his race discrimination claim which was insufficient to defeat summary judgment. *Edmond*, 2011 WL 4495638, at * 2.

*Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010), citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  A plaintiff must cast doubt on defendant's preferred reasons to allow a reasonable fact finder determine the reason given is not what motivated the adverse action.  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001).

Although Plaintiff cannot "quarrel" with the decision of Defendant, he can utilize evidence to question whether the alleged reason was merely used as a cover for race discrimination.  *Alvarez,* 610 F.3d at 1266, citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

In the instant case, there is a plethora of evidence to establish pretext sufficient to warrant a denial of summary judgment.

An employer's violation of its own procedures may be evidence of pretext. *Bass v. Bd. of Co. Commr's*, 256 F.3d 1095, 1108 (11th Cir. 2001)(overruled in part on other grounds, *Crawford v. Carroll*, 529 F.3d 961(11th Cir. 2008)). Defendant contends Plaintiff was terminated because he violated procedures set forth in the January 2, 2009 memo. (PL Ex. 19, Notice of Claim and Request for Separation Information).  However, Caucasian drivers were not terminated for violating the very same procedures all drivers, both in Birmingham and Gainesville, were expected to follow.

Plaintiff has submitted the Complaint and EEOC charge filed by African American employee, Larry Duncan, of Defendant alleging race discrimination. The other evidence, or "me too" evidence, presented by Plaintiff in response to Defendant's Motion for Summary Judgment is admissible, under Rule 404(b), to prove the intent of the Defendant to discriminate. *See Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1286 (11th Cir. 2008).

## VIII. CONCLUSION

Based on the above and foregoing, it is clear a reasonable jury could hear the evidence presented by Plaintiff and determine a question of fact exists as to the legitimacy and/or truth of the reasons asserted by Defendant for Plaintiff's termination. Defendant's reasons are fabricated in an attempt to guarantee summary judgment by creating a laundry list of old and previously unaddressed alleged transgressions of the Plaintiff. The truth is not only obvious but simple. Plaintiff's race was the motivating factor which led to his termination. As such, summary judgment is due to be denied by this Court.

Respectfully submitted this the **1st** day of **May 2012.**

/s/ Cynthia Forman Wilkinson
CYNTHIA FORMAN WILKINSON
State Bar ID No.: ASB-9950-L68C
Attorney for Plaintiff

**OF COUNSEL:**
**WILKINSON LAW FIRM, PC**
New South Federal Savings Building, Ste 811
215 North Richard Arrington Jr. Blvd.
Birmingham, Alabama 35203
Tel.:  (205) 250-7866
Fax:  (205) 250-7869
E-mail: wilkinsonfirm@bellsouth.net

/s/ Larry R. Mann
LARRY R. MANN
Attorney for Plaintiff

**OF COUNSEL:**
**Larry R. Mann, Esq.**
701 New South Saving Building
215 North 21st Street
Birmingham, Alabama 35203
Tel:  (205) 326-6500
Fax: (205) 324-8660
E-mail: LarryMann@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on **May 1, 2012**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Walter Kruger, Esq.
FISHER & PHILLIPS, LLP
1075 Peachtree Street, NE
Suite 3500
Atlanta, GA 30309

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: None

s/Cynthia Forman Wilkinson
**WILKINSON LAW FIRM, PC**