IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FREDERICK MOORE,** | ] |
| **Plaintiff,** | ] |
| v. | ] |
| | ] CV-11-BE-01000-S |
| **J & M TANK LINES, INC.,** | ] |
| **Defendant.** | ] |

**MEMORANDUM OPINION**

This case, alleging discrimination based on race, is before the court on "Defendant's Motion for Summary Judgment" (doc. 24). The motion has received thorough briefing. For the reasons stated in this Memorandum Opinion, the court DENIES the motion.

**I.  PROCEDURAL BACKGROUND**

On February 16, 2010, Plaintiff Moore filed a Charge of Discrimination with the EEOC. That Charge asserted that his employer, J & M Truck Lines, had discriminated against him based on race by giving whites more[1] favorable routes; by giving less senior whites newer, better equipment; by tolerating racial slurs at work; and by disciplining him more harshly than similarly situated whites. The Charge identified four employees as white comparators: a white

---

[1] Although the Charge actually states that the "[w]hites were given the less favorable routes," the court must assume that Moore meant to say they were given more favorable routes.

1

Birmingham driver mixed a load of flour with wheat and was given a 3 day suspension; "two white drivers in Barnville [sic] Georgia who work for my same supervisor who pumped off the wrong load in the wrong place and were only give a 5 day lay off" and "[a] white driver committed a 'hit and run' in a company vehicle but he was not fired for that violation."  (Doc. 24-3, at 2-3).

On August 13, 2010, Fisher & Phillips, attorneys for J & M, responded to the EEOC's request for additional information, including an attachment listing "Flour Division Disciplined Employees During Relevant Period."  That list included flour division employees at the Barnesville, Georgia as well as the Birmingham location.  For the listed employees at Barnesville with dates of discipline after mid-March 2010, Kenny Brown was listed as the discipline decision-maker.  Yet, the information next to employees Noah Stephens (Caucasian) and Doug Walker (African American) indicated that they had both received discipline on February 8, 2010 and that the discipline decision-maker was Jim Pickens.  In its reply brief, J & M argues through its Fisher & Phillips counsel that the August 13, 2010 letter written by Fisher & Phillips counsel is erroneous, inadmissible hearsay, unauthenticated, and contrary to sworn testimony; however, J & M has filed no motion to have that letter stricken.

On March 17, 2011, the Plaintiff, Frederick Moore, filed this suit, alleging race discrimination pursuant to Title VII and Section 1981.  Moore's original Complaint contained only one count, alleging race discrimination in violation of both Title VII and Section 1981 based on the same conduct set out in the EEOC Charge.  On February 28, 2012, prior to the filing of the motion for summary judgment, Moore's counsel informed the court and counsel for J & M at a status conference that he would no longer pursue any claim for discriminatory assignment of

equipment or routes, and that the only remaining claim was discriminatory termination based on race. Accordingly, that claim is the sole viable claim and the only one that this court addresses below.

## II. FACTS

Defendant, J & M Tank Lines, employed the Plaintiff, Frederick Moore, an African American, as a driver from November 2008 to September 4, 2009. He was originally hired to haul lime and soot, but then, at his request, he was moved into a truck driver position hauling on the flour side of the business, and that was his position at the time of his termination in 2009. As a flour truck driver, his duties included picking up the correct load, delivering it to the correct customer, and loading it into the correct silo.

In 2009, Rick Berger, a Caucasian, acted as the terminal manager and dispatcher for all flour drivers out of Birmingham, although later, in 2010, he became the central dispatcher and dispatched for the Birmingham and Barnesville, Georgia locations, both of which were delivering flour for Milner Milling. The Birmingham J & M flour terminal is actually located on the property for Milner Milling. In 2009, Berger directly supervised the Birmingham flour drivers, including Moore. As a terminal manager, Berger was responsible for disciplining his drivers, and any discipline would be documented in writing and placed in the driver's personnel file. Berger no longer works for J & M.

On January 2, 2009, Jim Pickens, J & M's Chief Operating Officer, sent a letter with a return address of the Birmingham Corporate Office to "FLOUR DRIVERS." The letter stated as follows.

    We continue to have problems with drivers not properly verifying

>paperwork, trailer number, and unloading line seal numbers prior to leaving the yard at the Mill.  By checking the seals we accomplish two things, the seals are on the trailer that are supposed to be and we have a [sic] hooked to the correct trailer.
>
>This verification cannot be done from inside the cab or your tractor or from inside the building.  You the driver must get out and physically check and verify the seals on the unloading line to ensure you have hooked to the correct trailer.  Then write the seal numbers on the paperwork, leaving the "pink" copy at the terminal prior to leaving the yard.
>
>If a driver hooks to the wrong trailer, fails to properly verify his paperwork or seal numbers, the driver risks termination.  Each driver must verify each load and each trailer prior to leaving the Mill, [sic] without this verification, if the driver arrives at customer or not, the driver risks termination form [sic] J & M Tank Lines.

(Doc. 8-1).

Jim Pickens testified he typed the letter himself and sent the letter only to Birmingham flour drivers, "[b]ecause Birmingham is where we were having the problem." (Doc. 27-8, at 10, p. 34).  Prior to Pickens's drafting the letter, a representative of Milner Milling had come to Jim Pickens and had advised him that hooking up mistakes had to stop or Milner Milling would not continue to use  J & M.  Different customers ordered different flour mixes, so pumping the wrong flour recipe into the wrong silo was a big problem.   Pickens stated, "It was pretty plain made to Mr. Berger before the next time when I wrote the memo in January, the next driver that hooked to the wrong trailer and delivered it would be terminated. . . ." (Doc. 27-8, at 7, p. 22).  Pickens stated that all the flour drivers in Birmingham signed the letter, and Frederick Moore signed the letter on January 2, 2009 underneath the statement: "I have read and understand the above letter."  (Doc. 8-1, at 2).

Berger, who in 2009 supervised the Birmingham flour drivers but not those in

Barnesville, testified that he assumed this letter had gone to flour drivers at both the Birmingham and Barnesville offices.  He stated:

> Q. [by MR. KRUGER]  You do not have any personal knowledge, do you, whether or not [the J & M letter "TO FLOUR DRIVERS'] was given out to any drivers at the Barnesville terminal, do you?
>     MS. WILKINSON:     Object to the form.
> A   I think they were given out to everybody, I thought.
> Q. Okay.  All right.
> A. May not have been, but I thought they were.
> RE-EXAMINATION BY MS. WILKINSON:
> Q. When you – you saw a copy of this memo when it came out; is that correct?
> ***
> A. Yes.
> Q. And you understood that it went to all flour drivers; is that –
> A. Well, I assumed.
> Q. And it says flour drivers; correct?
> A. Yes.
> Q. It doesn't limit it to Birmingham only, does it?
> A. It doesn't say that, you are right.
> Q. And the flour drivers were dispatched out of Barnesville; is that correct?
> A. Yes.
> Q. And you've told me that the policies were the same for Birmingham as they were for Barnesville; is that correct?
> A. Yes.
> Q. And based on what you understood when this policy came out, it applied to Barnesville as well; correct?
> A. That's my assumption.

(Doc. 27-7, at 19, pp. 74-76.

  Moore acknowledges that on September 3, 2009,  he "picked up the wrong trailer. . . with the wrong product in it .. . and took it to the wrong spot."  (Moore Depo. Doc. 24-8, at 22, p. 85). He excuses his mistake of hooking to the wrong trailer because rain was coming down at the time of the hook up, and he did not take the paper with verification numbers out in the rain.  In any event, because of that mistake, he pumped the wrong flour mix into Opelika Flowers Bakery's silo.  At first, the contact from Flowers Bakery wanted J & M to clean out the silo, but then the

bakery changed its mind and indicated that it could blend some other material with the flour and make it work. The product stayed as delivered, Flowers Bakery was able to use it, none of Flowers Bakery's cost was passed along to J & M, and Flowers Bakery remained a customer.

Berger advised Pickens about Moore's mistake, and Pickens stated that he made the call to fire Moore based on his violation of company policy. Berger informed Moore that the termination was not his decision. Berger filled out the separation notice for Moore stating that the circumstances of the separation were "Driver did not follow company policies and procedures." (Doc. 28-4, at 2). Berger signed the notice as terminal manager on September 4, 2009. Berger testified that during the discussion with Pickens about Moore's violation and the decision to terminate him, the subject of Moore's race never arose.

Moore's personnel file does not include any reference to previous disciplinary action for hooking up to the wrong trailer, and no evidence otherwise exists that, prior to the September incident with the Flowers Bakery mistake, Moore had ever hooked up to the wrong trailer.

In February of 2010, Moore filed a Charge of discrimination with the EEOC. As noted earlier, the Charge contained some allegations that are no longer viable. The allegations in the Charge that remain viable are that J & M treated Caucasian drivers differently who committed the same or similar mistakes as Moore did. Although Moore identifies several white comparators, because of the court's subsequent ruling, it need not recite the facts pertaining to all of those alleged comparators[2], but will confine the comparator facts to those relating to

---

[2] Other comparators Moore identified were Grant Wells, who hit a parked truck and who violated company policy in leaving the scene and failing to report the accident to police; and Gary Hill, who hooked up to the right trailer and delivered the product to the right customer but pumped the product into the wrong silo.

comparator Noah Stephens.

### Comparator: Noah Stephens

Noah Stephens, a Caucasian, worked as a flour driver at J & M's Barnesville, Georgia terminal. In 2010, Stephens hooked up to the wrong trailer, drove twenty minutes down the road, and then discovered his mistake before he delivered the product. During the same week, Doug Walker, an African American flour driver at the same Georgia terminal, hooked up to the right trailer but delivered it to the wrong bakery in Suwanee instead of the correct bakery in Savannah.

Kenny Brown testified that at the time of the incidents with Noah Stephens and Doug Walker, he had held the position of driver manager at the Barnesville location for a few months, and he directly supervised both drivers. Brown claims that prior to the mistakes of Stephens and Walker, he had never seen any documentation that if drivers hooked up to the wrong trailer they would be terminated. In 2009, when Pickens's letter to flour drivers was sent, Brown still held the position of loader, and Brown testified that he was not certain about the time frame of the incidents with Stephens and Walker, except that they occurred within a few days of each other in 2010, after he was promoted to driver manager, and probably in the fall of 2010. Brown acknowledges that he did not hold the position of driver manager in February 2010. (Brown Depo. Doc. 28-2, at 67 & 70). Brown testified that he did not talk to Rick Berger about the mistakes of Stephens and Walker, but instead, discussed both of them separately with Harold Sumerford, one of the owners of J & M. According to Brown's testimony, Sumerford told Brown that he was leaving to Brown the decision of what discipline was appropriate for both Stephens and Walker. Brown decided to give both Stephens and Walker a week's suspension without pay as discipline. He reported to Sumerford about that decision, Sumerford did not raise

any objections, and Brown then communicated that decision to Stephens and Walker.  Brown does not recall documenting the suspensions of Stephens and Walker.   Subsequent to this disciplinary action involving both Stephens and Walker, Charlie Pickens, originally safety supervisor and then safety director at J & M, advised Brown that he must document all disciplinary actions at a level leading to suspension,  and must place documentation in the worker's personnel file.

In his deposition testimony, Jim Pickens supports Brown's testimony that Brown and Harold Sumerford made the decision regarding discipline of Stephens and Walker, and that Pickens was not involved in the decision.

The August 13, 2010  letter from J & M's counsel, Fisher & Phillips, to the EEOC with a chart of disciplined flour employees and information about the discipline included Stephens and Walker in the list but stated that the date of their discipline was February 2010 and listed Jim Pickens as the decision-maker. (Doc. 28-1, at 2-6, Exhibit 10 to Pl.'s Evid. Sub.).  The Plaintiff provided this letter with attachments as evidentiary material opposing summary judgment, and provided no affidavit or declaration verifying the document.   J & M has filed no motion to strike that letter and attachments.   The court notes that the August 2010 date of this letter, listing the discipline of Stephens and Walker, is *before* the time period that Brown identified as when their disciplinary action took place – the fall of 2010.

### III.  STANDARD OF REVIEW

A.  Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*   If the moving party does not meet its burden, the court must deny the motion for summary judgment.

## IV.  DISCUSSION

### A. Claims in the Complaint other than Discriminatory Termination

Moore acknowledged in his opposition brief that he "conceded any claim regarding the discriminatory assignment of equipment or routes. . . and that [his] only remaining claim was discriminatory termination based on his race. . . ."  (Pl.'s Br. Doc. 29, at 4-5).  Therefore, the court FINDS that all claims stated in the Complaint are due to be DISMISSED *except* the claim of discriminatory termination based on race.

9

### B. Discriminatory Termination Based on Race

The remaining claim is discriminatory termination based on race. Where no direct evidence of discrimination exists, Moore must first present evidence proving the following elements of his *prima facie* case:

> (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was ... treated less favorably than a similarly-situated individual outside his protected class.

*Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't. of Educ.,* 342 F.3d 1281, 1289 (11th Cir. 2003).

J & M acknowledges that Moore meets elements one and three, but asserts that he has failed to meet the remaining elements. The court FINDS, however, that Moore has presented sufficient evidence on element two, qualification for the position. J & M acknowledges that Moore held the position in question but merely argues that his violation of company policies in the incident made the basis of his termination necessarily means that he was not qualified to be a flour driver. J & M provides no authority for that conclusion, and this court finds none. The Eleventh Circuit has stated that where a plaintiff has held the work position for a "significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred." *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1386 n. 7 (11th Cir. 19832) (emphasis in original). While Moore had only held his position for approximately one year, that tenure, coupled with a lack of evidence regarding any issues with Moore's work prior to the incident made the basis of this suit, sufficiently satisfies the element of qualification for the purpose of establishing the *prima facie* case.

Instead, the key issue is whether Moore has presented comparator evidence sufficient to establish element four. In addressing this issue, the court finds that genuine issues of material fact exist whose resolution is the province of the jury, not this court.

For example, conflicting evidence exists about whether Jim Pickens, the ultimate decision maker for Moore's termination, was also the decision maker exacting milder discipline – suspension – upon Noah Stephens, a Caucasian, for the same general offense of hooking up to the wrong trailer and leaving the premises. Brown, the current driver manager at the Barnesville, Georgia site, testified that Pickens was not the decision-maker regarding Stephens's suspension. Instead, Brown stated that he and Harold Sumerford were the decision-makers who disciplined Stephens, that the disciplinary action occurred in the fall of 2010, and that he was not the driver-manager of Stephens in February of 2010. Similarly, Jim Pickens testified that Brown and Sumerford were the decision-makers about Stephens's transgression, and that he himself had no input. The personnel file of Stephens includes no documentation of the 2010 discipline action.

However, J & M's *August 13, 2010* letter to the EEOC, prepared by their attorneys in response to the EEOC's request for more information regarding Moore's EEOC Charge of Discrimination, contains contrary information. Attached to the EEOC letter are charts, one of which is captioned "Flour Division Disciplined Employees During Relevant Periods," and includes employees Noah Stephens and Doug Walker from the Barnesville, Georgia location with February 8, 2010 date of discipline and Jim Pickens as the decision-maker. *Both* the date of the discipline and the decision-maker listed on this document do indeed conflict with Brown's sworn testimony and the testimony of Jim Pickens.

The court notes that even the date of the EEOC letter – August 13, 2010 – conflicts with

Brown's sworn testimony, because Brown set the time period of his discipline of Stephens and Walker at the fall of 2010. However, the EEOC letter was sent before the fall of 2010 and already listed those disciplinary actions. Therefore, unless the date on the EEOC letter was incorrect or was changed, a claim no party has made, Brown's testimony about the timing of the discipline must be wrong. This conflict places J & M in an awkward position. Its attorneys must argue – based on the evidence currently before the court – *either* that the information they sent on behalf of J & M to the EEOC was wrong *or* that the testimony of Brown, their key witness, was wrong. J & M chooses the first option, acknowledging that their attorneys – the same ones that represent them in this suit – submitted erroneous information to the EEOC in an official response to a request about a Charge. However, regardless of who was right and who was wrong, that conflict means that an issue of material fact exists: whether Jim Pickens was the decision-maker in both disciplinary actions is indeed material to the case.

      J & M attempts to survive summary judgment by arguing that this issue of material fact is not genuine, because the document creating the conflict should be disregarded as "inadmissible hearsay, an unauthenticated, out of court, unsworn letter, made with no personal knowledge [and] in error." (Def.'s Reply, Doc. 32, at 8). If J & M desires that the EEOC document be disregarded as improper evidence, the correct procedure would be to file a motion to strike, which it has not done. In any event, the court disagrees with J & M's argument that the EEOC letter is improper evidence. The current version of the Federal Rules of Civil Procedure does not require that "evidence" submitted in support of summary judgment be sworn affidavits or documents authenticated by sworn testimony, but instead provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2). Given that the document in question is a statement of a party opponent, a business document that J & M itself submitted as an official response to an EEOC request, any objections about its propriety as evidence are disingenuous. J & M may explain the origin of any "errors" in that document to the jury.

In sum, the court finds that a genuine issue of material fact exists as to whether Jim Pickens was the decision-maker in the disciplinary action of Noah Stephens. Having found that a genuine issue of material fact exists, the court further finds that summary judgment is inappropriate and J & M's motion for summary judgment is due to be DENIED. This case will move forward to trial.

Dated this 27th day of August, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE